## JOHN SEATON V. STATE OF NEBRASKA.

### FILED OCTOBER 14, 1921.    No. 21928.

1. **Criminal Law: CONTINUANCE: SHOWING.** Defendant's motion and affidavit for a continuance on the ground of the absence of a material witness, or for time to take his testimony, examined, and *held* insufficient.

2. ————: **VENIREMEN: COMPETENCY.** The question of the competency of a venireman to sit in the trial of a criminal case cannot be raised by a motion for a continuance.

3. ————: **JURORS: QUALIFICATION.** Where two or more persons are jointly indicted or informed against for the commission of a single offense and sever in their trials, jurors who sat in the trial of one are thereby disqualified to sit in the trial of another.

ERROR to the district court for Otoe county: JAMES T. BEGLEY, JUDGE. *Reversed.*

*D. W. Livingston,* for plaintiff in error.

*Clarence A. Davis, Attorney General,* and *Jackson B. Chase, contra.*

Heard before MORRISSEY, C.J., ROSE and ALDRICH, JJ., ALLEN and REDICK, District Judges.

ALLEN, District Judge.

May 7, 1920, about 2:30 a. m., the residence of Edwin A. Duff, in Nebraska City, was burglarized, and the plaintiff in error, herein called the defendant, and one William Holmes were arrested as participants therein. June 4, 1920, the county attorney filed an information in the district court for Otoe county against "John Seaton, William Holmes, John Doe, real and true name unknown, John Stiles, real and true name unknown, Richard Roe, real and true name unknown," charging them with having jointly committed the offense, and the defendant and Holmes entered pleas of not guilty, the other defendants not being apprehended. The defendant and Holmes severed in their trials, Holmes' trial being concluded Sep-

tember 16, 1920, and the defendant was tried and found
guilty on the same day, the jury consisting of Henry
Reese, James Meek, William Ottens, Ed. South, Mike
Roddy, J. H. Carlson, R. R. Booth, Richard Arends, Al
Patten, George Roos, C. C. Heck, and Ed Smallfoot. Be-
fore the jury were impaneled, the defendant filed a mo-
tion for a continuance to the next term because of the
absence of Schull, said to be a material witness for the
defendant, but then in South Dakota, and because Holmes
had been tried by 12 of the panel summoned for the term,
23 of whom were present, while the other 11 were in court
and listened to the trial, which he claims rendered them
incompetent to try him. The substance of that part of
the defendant's affidavit which was filed in support of his
motion respecting Schull's absence is to the effect that
he was then at an unknown place in South Dakota, but,
"if present, would testify that this defendant was hired by
him on the evening of May 6th to drive him, the said
Schull, in an automobile to Nebraska City, which the said
defendant did; that the business of the said Schull at Ne-
braska City was not made known to this defendant; that,
if said Schull had anything to do with the alleged
burglary, this defendant had absolutely no knowledge of
that fact;" and "that he has made diligent search and
effort to locate the said witness, Schull; that the best in-
formation he can get with reference to his whereabouts is
that the said Schull is working with a threshing crew in
South Dakota, but just where or with whom in said state
he has been unable to learn; that he expects and intends
to locate the said Schull and have his testimony for use
upon the trial of this case at the next term of this court."

In so far as a continuance was sought on account of
Schull's absence, we think the affidavit was insufficient.
It fails to show that the defendant was ignorant of any
other person or persons within the jurisdiction of the
court by whom the same facts could be proved. The
statement that Schull hired the defendant to drive him
to Nebraska City, but that his business there was not

made known to the defendant, and that, if Schull had anything to do with the alleged burglary, the defendant had no knowledge of it, has no bearing on the case. The defendant does not negative the charge that he committed or participated in the commission of the crime. Instead of stating in general terms that he had made diligent search and effort to locate Schull, he should have set out the facts, so that the court could determine whether he was diligent or not. When charged with the offense, he should have taken prompt steps to secure Schull's presence at the trial, or to take his deposition, if his presence could not be obtained, but he did not do so. He could not wait until the last moment and expect the court to grant a continuance on the showing made. Respecting that part of the affidavit for a continuance on the ground that nine of the jurors who sat in the trial of Holmes and were retained in the trial of the defendant were, by reason of that fact, incompetent, it is sufficient to say that it afforded no grounds for a continuance. *Humphries v. State,* 100 Ga. 260. If these jurors were disqualified, a motion to discharge them and to summon others under section 9106, Rev. St. 1913, would probably have been sustained; but, as the defendant fully presented and preserved the question of his challenges, the denial of his motion was without prejudice.

Having disposed of the defendant's application for a continuance, we turn to a more difficult question raised by his fourth assignment of error in these words: "The court erred in forcing the plaintiff in error to be tried by the same jury who had tried one of his codefendants upon substantially the same testimony."

The list from which the jury were selected consisted of 23 names, of which 3 were excused for cause, the defendant challenged 6 peremptorily and the state 1, and 1 was probably excused by the court itself, leaving 13, 9 of whom, Ottens, South, Roddy, Booth, Carlson, Arends, Patten, Roos, and Smallfoot had served in the Holmes trial. Smallfoot being called after the defendant had exhausted

his peremptory challenges was retained over the defendant's objection. It is evident that, when the panel was completed in the Holmes trial, the name-slips were replaced in the receptacle containing the names of veniremen who had appeared, and, when the clerk drew for the defendant's trial, they were taken therefrom.

The information charges in apt language that the defendants named jointly burglarized the house of Mr. Duff, and the state claims that Holmes and the defendant were of the number. The identical transaction, the single *corpus delicti,* the body or essence of the crime in the Holmes trial, is the foundation of the defendant's trial. The testimony tends to show that the persons engaged in the burglary stopped near the Duff home, and, while some were ransacking the house, the defendant and another stood as an armed guard. Each of the 9 jurors stated on his *voir dire* examination that he had served on the Holmes panel; that he had not formed or expressed an opinion as to the defendant's guilt or innocence, and believed that he could try the defendant fairly and impartially and give him the benefit of any reasonable doubt in the case. It is urged that by reason of their service on the Holmes jury, these gentlemen were disqualified to sit in the trial of the defendant. In our judgment, it was impossible to separate the defendant from Holmes in the commission of the crime, and it is inconceivable that Holmes could have been tried without proving the *corpus delicti* necessary to be proved in this trial, and the evidence in the Holmes trial must, of necessity, to that extent at least, have been the same on the trial of the defendant. The witnesses for the state on the Holmes trial, to wit, Mrs. Frank Chapin, R. H. Fischer, Edwin A. Duff, Jess Palmer, and Paul Jessen, were witnesses for the state on the trial of the defendant. It is possible, but not probable, that Holmes was tried without the name of the defendant being mentioned in connection with the offense, although Ottens, South, Roddy, Booth, Carlson, Arends, Patten, and Smallfoot, remember the substance of the

testimony in that trial, and South, Carlson, Arends, Patten, and Smallfoot recollect that the prosecuting attorney and some of the witnesses mentioned the name of the defendant.

In section 11, art. I of the Constitution, it is provided that one charged with a crime is entitled to "a speedy public trial by an impartial jury," which provision is to be construed with subdivision 2, sec. 9109, Rev. St. 1913, which provides, *inter alia*, that, if a proposed juryman "has formed or expressed an opinion as to the guilt or innocence of. the accused," he may be challenged for that reason. *Curry v. State,* 5 Neb. 412.

The trial by jury took on a divine hue when the "sworn twelve" were chosen in memory of the twelve Apostles on the twelve thrones; the twelve tribes of Israel, the twelve patriarchs, and the twelve officers of Solomon. The right was wrested from King John at Runnymede in 1215 and incorporated in Magna Charta and subsequent revisions thereof, but it was denied for many centuries by his successors. It was transplanted to the United States by the Pilgrims, and, when not refused by royal governors, was the settled practice of the colonists. It found lodgment in the Declaration of Rights of the first congress in 1774, and in the Declaration of Independence in 1776. It was guaranteed by the ordinance for the government of the Northwest Territory in 1787. It was insisted on in the ratifying conventions of the respective states. It was written in the sixth amendment of the Constitution of the United States that, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury," and it is imbedded in the Constitution of every state of the Union. The struggle for its recognition and preservation was long, bitter, and sometimes bloody. It has been a safe refuge against the invasion of an aggressive and arbitrary power on the one hand, and a sometimes turbulent populace on the other. Speaking of its sanctity, Mr. Sedgwick in his work on Statutory and Constitutional Law (2d ed.) 482, says:

"The trial by jury is very dear to the race to which we belong. There can hardly be. named any institution which has survived so many. changes, or existed under such various forms of government.   *   *   *   When this country threw off the government of England, the passionate attachment of our people to this form of procedure was repeatedly and energetically declared; and the Constitution of the youngest state of the American confederacy adopts the trial by jury as a part of its fundamental law.. Springing up under the feudal despotism of the Plantagenets, it has survived alike their rule, that of the house of Tudor, and of the house of Stuart, and now flourishes with all its original vigor under the mildest and wisest form of monarchy of which history makes mention; while during the same period, transplanted to a different hemisphere, it has struck deep its roots into the new soil, and is, perhaps, the most cherished institution of the greatest exemplar of free and intelligent government that the world has ever seen."

President Jefferson in his first inaugural address in 1804 speaks of "trial by juries impartially selected" as one of the blessings of the American people. Mr. Hume in his history speaks of it as "an institution admirable in itself, and the best calculated for the preservation of liberty and the administration of justice that ever was devised by the wit of man."

Mr. Starkie says in his work on Evidence (10th ed.) *9: "It is obvious that the experience which would best enable those whose duty it is to decide on matters of fact, arising out of the concerns and dealings of society, to discharge that duty, must be that which results, and which can only result, from an intimate intercourse with society, and an actual knowledge of the habits and dealings of mankind; and that the reasoning faculties best adapted to apply such knowledge and experience to the best advantage in the investigation of a doubtful state of facts are the natural powers of strong and vigorous minds, unencumbered and unfettered by the technical and artificial rules

Seaton v. State.

by which permanent tribunals would be, apt to regulate their decisions. Nor is the trial by jury less recommended by considerations of extrinsic policy. It constitutes the strongest security to the liberties of the people that human sagacity can devise; for, in effect, it confides the keeping and guardianship of their liberties to those whose interest it is to preserve them inviolate; and any temptation to misapply so great an authority for unworthy purposes, which might sway a permanent tribunal, can have no influence when entrusted to the mass of the people to be exercised by particular individuals but occasionally."

And Sir William Blackstone says in 4 Blackstone (Jones, 1916) sec. 395: "The antiquity and excellence of this trial, for the settling of civil property, has before been explained at large. And it will hold much stronger in criminal cases; since, in times of difficulty and danger, more is to be apprehended from the violence and partiality of judges appointed by the crown, in suits between the king and the subject, than in disputes between one individual and another, to settle the metes and boundaries of private property. Our law has therefore wisely placed this strong and two-fold barrier, of a presentment and a trial by jury, between the liberties of the people and the prerogative of the crown. It was necessary for preserving the admirable balance of our Constitution to vest the executive power of the laws in the prince, and yet this power might be dangerous and destructive to that very Constitution, if exerted without check or control by justices of *oyer* and *terminer* occasionally named by the crown, who might then, as in France or Turkey, imprison, dispatch or exile any man that was obnoxious to the government, by an instant declaration that such is their will and pleasure. But the founders of the English laws have with excellent forecast contrived that no man should be called to answer to the king for any capital crime unless upon the preparatory accusation of twelve or more of his fellow subjects, the grand jury, and that the truth

of every accusation, whether preferred in the shape of indictment, information or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbors, indifferently chosen and superior to all suspicion. So that the liberties of England cannot but subsist so long as this palladium remains sacred and inviolate, not only from all open attacks (which none will be so hardy as to make), but also from all secret machinations which may sap and undermine it, by introducing new and arbitrary methods of trial by justices of the peace, commissioners of the revenue and courts of conscience. And however *convenient* these may appear at first (as doubtless all arbitrary powers, well executed, are the most *convenient*), yet let it be again remembered that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our Constitution; and that, though begun in trifles, the precedent may gradually increase and spread, to the utter disuse of juries in questions of the most momentous concern. What was said of juries in general, and the trial thereby, in civil cases, will greatly shorten our present remarks with regard to the trial of criminal suits; indictments, informations and appeals; which trial I shall consider in the same method that I did the former, by following the order and course of the proceedings themselves as the most clear and perspicuous way of treating it."

In respect to the qualifications of a juror, Mr. Bishop, who is confessedly one of the ablest and most thoughtful writers on the criminal law of this country, in 1 Bishop, Criminal Procedure, sec. 910, has this to say: "The true view would seem to be that, since the law presumes every man to be innocent until he is by judicial evidence proved in a court of justice to be guilty, and since the burden is on the prosecuting power to make the guilt appear affirmatively by proofs produced at the trial, if a man

leaps in advance of the law, and settles in his own mind the question of guilt against the prisoner, whether by reason of what he has read or heard, or by reason of an inner impulse which condemns before it hears, he is not a fit person to be a juror in the cause; for his mind, which ought at least to be a blank on which the evidence might write its conclusions, is already preoccupied. It is vain for a man to say, or even believe, that he can judge impartially of a matter which he has already determined. Human nature, as developed in the average of men, does not permit this. The juror is to hear, and then say what he believes; but, if he believes before hearing that only which can lawfully affect his belief—namely, the testimony of the witnesses in open court—he is, in legal reason, disqualified to hear and be swayed by the testimony. It is immaterial, therefore, whether the belief which comes not according to the law is derived from rumor, or from listening to statements of a more reliable sort. Likewise, if the juror has not expressed his belief, he is still unfit, though the expression of it might render him unfit in a yet higher degree. Such is the legal reason which should govern the question."

In impaneling the jury in the great case of *United States v. Burr*, 25 Fed. Cas. No. 14,693, pp. 55, 77, Chief Justice Marshall observed: "The chief justice observed that it might save some altercation if the court were to deliver its opinion at the present time; that it was certainly one of the clearest principles of natural justice, that a juryman should come to a trial of a man for life with a perfect freedom from previous impressions, that it was clearly the duty of the court to obtain, if possible, men free from such bias; but that if it were not possible from the very circumstances of the case—if rumors had reached and prepossessed their judgments—still the court was bound to obtain as large a portion of impartiality as possible, that this was not more a principle of natural justice, than a maxim of the common law, which we have inherited from our forefathers, that the same

right was secured by the Constitution of the United States, which entitles every man under a criminal prosecution, to a fair trial by an 'impartial jury.' Can it be said, however, that any man is an impartial juryman who has declared the prisoner to be guilty and to have deserved punishment? If it be said that he has made up this opinion, but has not heard the testimony, such an excuse only makes the case worse; for if the man has decided upon insufficient testimony, it manifests a bias that completely disqualifies himself from the functions of a juryman."

And Owen, J., says in *Scribner v. State of Oklahoma,* 2 Okla. Cr. Rep. 601, 35 L. R. A. n. s. 985, 991, quoting from *Johnson v. State,* 1 Okla. Cr. Rep. 321: "But the enumerated causes of challenge in the statute are not exclusive of all others not enumerated. When the juror has any opinion as to the guilt of the defendant, it matters not how this opinion was formed, the closing paragraph of the statute provides that it must appear to the court that the juror can and will act fairly and impartially in the case. But, if this provision was not in the statute, we would be forced to place this construction upon the first part of the statute, because section 20 of our Constitution is in this language: 'In all criminal prosecutions, the accused shall have the right to a speedy and public trial by an impartial jury.' Const. art. II, sec. 20. Any statute which would even tend to deprive a defendant of a trial by an impartial jury would be unconstitutional and void. Although a juror may know absolutely nothing about the facts of the case, and may not have the slightest opinion as to the guilt of the defendant, yet if, from any cause or upon any ground, it appears to the trial court that the juror is biased or prejudiced against the defendant, it cannot be said that he would be a fair and impartial juror, and he should be excluded from the jury; otherwise, the Constitution of the state would be disregarded and trampled upon. The trial court should resolve all doubts upon this matter in

favor of the defendant."

In 2 Lieber, Political Ethics (2d ed.) 405, the learned author observes: "By the institution of the jury two great ends, the one of liberty, the other of the administration of justice, have been united, namely, direct participation of the people in the dispensing of justice and the preventing of it from falling entirely into the hands of the executive or of a separate and closed caste. From whatever point of view we may examine this peculiar institution as it has developed itself in the Anglican race—and it may be viewed in a great many, all equally important—it will always appear that the citizen cannot act in any more solemn capacity than that of a juror; in my opinion, in no capacity so solemn and important. Society requires the state; the state acts through laws; the laws are the great organs of human society, of combined reason; and now, when the very moment ultimately arrives for which the law was made, when it is finally to be applied as a general rule to. a practical and concrete case, when, in short, the abstract principle is to be realized in practical. life, for weal or woe, for the protection of some or the punishment of others, all this is in a great measure left to the juror, to the citizen taken fresh from the people. The jurors, therefore, are justly called by the British law the country. There is a deep meaning in this expression, as it has grown in the course of centuries; for the jury truly and practically represent the country to the person that is to be tried. The law is the expression of public will, and the jury represent the jural society, in judging whether in the given case the facts warrant the application of the law. The jury represent the country, not the government; they judge of facts according to rules and laws indeed, but also with the feelings of living men, and not merely as if they represented the abstract law as it is written down. To represent this a learned judge would be sufficient. The jury represents, or rather is, whenever faithful, the living, operating law. Indeed, it may justly be said that though. for a brief

time, yet, for this brief time, a jury represents more fully and entirely human society as formed into a state, with its great objects, than any other person or body of men, even the monarch's person not excepted. Not that I mean to intimate the idea as if on this account the jury were released either from strict obedience to law or proper advice. Even though they were the very sovereign, we have seen on a previous occasion that sovereignty and absolute power are very different. On the contrary, the jury according to the essence of their character are strictly bound by the law, yet by the law as their country requires it, or must be supposed to require it, applied to the particular and, probably, complex case before them."

Having shown that a jury is, under our form of government, indispensable in the administration of the criminal law, it will probably be accepted as a truism that freedom from bias is as indispensable in that body as it is in the presiding judge. We cannot have two kinds of juries, one for the guilty and another for the innocent, as every defendant enters upon the trial with the presumption of innocence in his favor, which continues with him as a matter of evidence until such time as his guilt may be proved beyond a reasonable doubt. *Garrison v. People,* 6 Neb. 274, 285; *Olive v. State,* 11 Neb. 1, 20; *Long v. State,* 23 Neb. 33, 55; *Flege v. State,* 90 Neb. 390. Verdicts can be set aside and new trials granted in both civil and criminal cases, except a verdict of not guilty where the Constitution protects the accused from being "twice put in jeopardy for the same offense;" and a verdict of acquittal of a guilty person has met with the approval of no less a jurist than Lord Mansfield. 2 Lieber, Political Ethics (2d ed.) 408.

And now we come directly to the pivotal question in the case: Were the nine jurymen who sat in the trial of Holmes, jointly informed against with the defendant and three other persons for the commission of a single offense, qualified, over objection, to sit in the trial of the

defendant? We think not. If that were true, these
gentlemen would be eligible as jurymen in the separate
trials of each of the other defendants. This conclusion
is supported by the weight of authority and the better
considered cases. Thus in *People v. Troy,* 96 Mich. 530,
it is said:

"We think, however, that the court erred in permitting
the jury who sat in the Flanders case to sit in the present.
The facts are nearly identical, and must necessarily have
all been called forth in the Flanders trial. The jury in
that case must have considered them, and reached some
opinion as to the merits of the controversy in the present
case. The respondent was entitled to a fair and impartial
trial by an impartial jury, who had no preconceived
opinions of his guilt or innocence. We are aware that
some English and American authorities hold that jurors
who have sat in one case are not disqualified from sitting
in a case against another joint respondent, who has taken
a separate trial, and involving the same state of facts.
We are not inclined to follow that doctrine. Where the
issue is the same in both cases, it is but fair to the re-
spondent that he have another panel of jurors to try his
cause. For this reason the verdict must be set aside,
and a new trial ordered."

So in *Priestly v. State,* 19 Ariz. 371; 377, 3 A. L. R.
1201, 1205, Chief Justice Franklin says: "The tendency
of legislation is to increase the dignity of the jury and
lessen the power of the courts to influence or control
their verdicts. It is indispensable, therefore, to the due
administration of the law that this important right be
carefully guarded. No higher duty rests upon the trial
judge than to see that an unbiased, unprejudiced, and im-
partial jury should in every case be provided. If jurors
objectionable in the particulars here stated are permitted
to serve, this case must become a precedent for others
sure to follow, and thus the impairment of the right will
insidiously gain such a foothold that the right itself
would in time become the mere echo of a voice, a shadow,

not substance, and as 'idle as a painted ship on a painted ocean.' These objectionable jurors are no doubt good men and representative citizens, perfectly conscientious in the belief they expressed of an ability to be indifferent between the state and the defendant, notwithstanding the knowledge they had obtained of the facts and witnesses in a court of justice where they had sat as jurors and given their verdict. So, too, the action of the learned trial judge, we are persuaded, was dictated by a proper sense of propriety and decorum. But the weakness and error in the ruling lay in the trial judge having that confidence in the ability of the jurors to be entirely impartial under the circumstances, which confidence the jurors had expressed, each in himself. Having passed upon the credibility of witnesses in a similar case upon substantially the same testimony, and having theretofore rendered a verdict on their oaths, it is not to be believed that they could sit upon this case with such an opinion previously formed without it influencing their action."

And in *McKay v. State,* 6 Ga. App. 527, the defendant and one Hickman were jointly accused of an offense, but severed on the trial. Hickman was convicted, and, on the defendant's trial, the court permitted the state to ask each juror on his *voir dire* examination if he had formed or expressed an opinion as to the guilt of the defendant, and four stated that they had and eight that they had not. The court discharged the four, but permitted the eight to serve, and this ruling was assigned as error. In reversing the judgment, Russell, J., speaking for the court, said:

"In the case at bar it plainly appears that the two offenses do involve the same transaction, inasmuch as the two defendants were jointly accused, and it further appears that the other defendant had been convicted. Jurors should go into the jury box entirely free from even a suspicion of having prejudged the defendant or formed any opinion upon his guilt; and where a juror has participated in a verdict of guilty against another person

charged with the same offense, growing out of the same transaction, and necessarily to some extent depending upon the same evidence, he has, in some degree at least, prejudged the defendant.  See *Jacobs v. State,* 1 Ga. App. 519, wherein this court said: 'It is the duty of a trial court to see that defendants in criminal cases are tried by a jury such that not even the suspicion of bias (leaning) or prejudice (prejudgment) can attach to any member thereof.'  Unless the jury be absolutely impartial, the jury system becomes an 'awkward instrument of justice,' and the constitutional guaranty that 'every person charged with an offense against the laws of this state * * * shall have a public and speedy trial by an impartial jury' * * * is worthless."

This rule is recognized in 17 Standard Ency. of Procedure, 347: "A juror," it is said, "is incompetent where he has sat on a jury that tried another jointly indicted defendant, even though he says he has formed no opinion and can try defendant impartially."

To the same effect, see section 9106, Rev. St. 1913; *United States v. Smith,* 27 Fed. Cas. No. 16342b, p. 1246; *People v. Mol,* 137 Mich. 692, 68 L. R. A. 871; *Burns v. State,* 145 Wis. 373; *Scribner v. State of Oklahoma,* 3 Okla. Cr. Rep. 601, 35 L. R. A. n. s. 985, and notes; notes to *Priestly v. State* (19 Ariz. 371) 3 A. L. R. 1201; 24 Cyc. 278, 279.

We hold that this case presents an instance of implied bias, and that the learned trial judge erred in denying the defendant's challenges to the jurors who sat in the Holmes trial.   The judgment of the district court is therefore reversed and the cause remanded for a new trial.

Rᴇᴠᴇʀsᴇᴅ.