FLORENCE E. BETHEL, ADMINISTRATRIX, APPELLEE, v. PAWNEE COUNTY, APPELLANT.

FILED JANUARY 30, 1914. No. 17,414.

1. **Evidence** examined and set out in the opinion, *held* sufficient to sustain the verdict.

2. **Appeal:** RULINGS ON EVIDENCE. The rulings of the trial court in the admission and exclusion of evidence, examined and set out in the opinion, sustained.

3. **Witnesses:** CROSS-EXAMINATION. It is not error for the trial court to refuse to permit evidence in support of an affirmative defense to be elicited on cross-examination.

4. **Appeal:** INSTRUCTIONS. The rulings of the court in the giving and refusing of instructions, set out in the opinion, sustained.

5. **Counties:** REPAIR OF BRIDGES: LIABILITY. Where a bridge is built in a public road upon the line between two counties, part of such public road having been established by each county, it is the duty

of each county to use reasonable diligence to keep such bridge in a reasonably safe condition for the use of the traveling public, regardless of the fact that such bridge may have been built by and 'at the separate expense of one of the counties; and for a failure to perform this duty such counties are jointly and severally liable.

6. **Trial:** WITHDRAWAL OF REST: DISCRETION OF COURT. It is within the sound discretion of the trial court to permit either party, after both sides have rested, to withdraw his rest and introduce further evidence; and its action in so doing will not be ground for a reversal unless it clearly appears that the granting of such permission was, under the particular circumstances of the case, an abuse of such discretion.

7. **Executors and Administrators:** FOREIGN ADMINISTRATORS: RIGHT TO SUE: REVOCATION OF LETTERS. Under section 5189, Ann. St. 1909, an executor or administrator duly appointed in any other state may commence and prosecute an action or suit in any court in this state in like manner and under like restrictions as a nonresident may be permitted to sue; and the fact that, subsequent to commencing an action in this state, such foreign executor or administrator removes from the state where he was appointed into this state will not *ipso facto* revoke his letters testamentary or of administration.

8. **Evidence:** STATUTES OF ANOTHER STATE: PRESUMPTION. The statutes of another state must be pleaded and proved to be of any avail. In the absence of such pleading and proof the laws of the sister state will be presumed to be the same as our own.

APPEAL from the district court for Pawnee county: LEANDER M. PEMBERTON, JUDGE. *Affirmed.*

*S. J. Graham* and *J. C. Dort,* for appellant.

*Frank A. Barton, contra.*

FAWCETT, J.

From a judgment of the district court for Pawnee county, in favor of plaintiff, for damages occasioned by the death of plaintiff's decedent, Robert Bethel, which resulted from the giving way of a bridge in one of the public roads of defendant county, defendant appeals.

The road in which the bridge was located is on the state line between the states of Nebraska and Kansas. It was

four rods wide. Two rods of this width were in the state of Kansas and two in the state of Nebraska, so that the center of the road was the state line between the two states. At the point where the accident occurred there was a creek or ditch. During portions of the year this creek, as we will term it, was dry, while at other times in the year, and particularly after heavy rains, a considerable body of water would flow through it. It had a watershed of about 100 acres of land. Some four or five years before the accident, the road supervisor in Nemaha county, Kansas, constructed a bridge over this creek. His testimony is that it was built with short posts, six in number, about three feet long, with two-inch plank for caps, upon which were placed nine stringers, fourteen feet long, upon which was placed "two-inch stuff flooring fourteen feet long." He testified that at the time he built the bridge the creek was about four feet deep and four feet wide; that in building the bridge it had at least five feet on each bank for support. This testimony shows that the bridge, as originally constructed and placed in position, was a safe structure. The testimony of the witnesses produced at the trial fairly establishes the fact that at the time of the accident the washing of the water under this bridge from time to time had increased the depth of the creek to eight feet and its width to twelve feet. The testimony of the witness Lepley was that he lived about three and a half or three and three-quarters miles east of the bridge; that for six months prior to the accident he farmed one place east and one west of the bridge, and went back and forth, he thought, once a week. He said: "I noticed the ditch, but not in particular. I think it was practically the same size for several weeks or months." It appears from this testimony that for a period of several weeks at least this fourteen-foot bridge was spanning a creek twelve feet wide. The condition of the bridge had thus been changed so that, instead of each end having a support of five feet, on a bank four feet high, one end at least had a support of not to exceed one foot, on a bank eight feet high.

On the morning of the accident, which was on May 7, 1910, Mr. Lepley was approaching the bridge with one or more loads of corn. When he reached the bridge he discovered it was out, and found a Mr. Mitchell at work trying to extricate the decedent, in which work he immediately assisted. When asked what part of the bridge decedent was lying under, he answered: "The north end of the bridge, pretty well to the north end of the bridge, on the west side. The bridge stood about a third pitch. The east end was still on the bank." At the time of the accident the decedent and his young son were traveling westward in a light spring wagon, and, according to the boy's testimony, as they neared the west end of the bridge it collapsed, with the result shown by the testimony of Mr. Lepley. Mr. Lepley further testified that he noticed the construction of the bridge the morning of the accident. He said: "I think the east side had a few stakes, they call them piling, about three feet long, and I think it was the east side was spiked to that, and the west side, the stringers were just on the bank, cut in the dirt, and set there. I don't think there was any piling. I never noticed any on the west side at all. I did not examine the bridge in particular to see if any remains of any posts or piling. I just looked the bridge over. * * * The bank had given away so the end piling could be seen exposed. I didn't notice the one under the bridge. It was not so you could see it. Could see the one at the southeast corner of the bridge, not full length. Q. Could you tell where the bottom of that piling was? A. Well, it was rotted off. I walked up and looked at it, but didn't examine it in particular. * * * Q. You say it was rotted off. What was rotted off? A. This piling or posts. Q. Where? A. At the east end of the bridge. It was rotted all along. The post was all rotted. I could not tell what its length had originally been. I did not examine the one at northeast corner. I had been using this bridge for three years, hauling heavy loads over it. Q. All these three years did you ever hear any suggestions whether it was safe or unsafe? A. I never did this bridge in par-

ticular." On cross-examination he testified that he did not examine the post of which he had spoken to see if it was rotten clear through or not, "but by the appearance it had rotted clear through. I didn't examine it; it was just a matter of opinion; it was not broken off." He further testified that he did not know how much of a bank there was at either end; that he had never noticed whether the bank was caved away; that the morning of the accident the roads were pretty heavy. "There had been very heavy rainfalls. There didn't seem to be much water in this creek at this time. I think the water had been pretty high. This is a short creek, would fill quickly and empty quickly; that very heavy rainfall precipitated in a very short time filled it full. That is the nature of all these streams. That high water would naturally work in the banks and wash them out continually."

It is not claimed that the county commissioners or road officers of defendant county had ever received actual notice of any dangerous condition of the bridge, so that the question is: Had the bridge and approach thereto been in an unsound and unsafe condition for so long a time prior to the accident that the county officials, had they used reasonable care and diligence in inspecting and caring for the bridge, would have known of its unsafe condition long before the accident occurred, as charged in the petition? We think the testimony of Mr. Lepley, which in some points was corroborated by other witnesses at the trial, was sufficient to take the case to the jury upon that point; and, the jury having found for the plaintiff, the verdict cannot be disturbed on the ground that it is not sustained by sufficient evidence. This holding necessitates a consideration of the several questions of law urged by defendant.

It is first urged that counsel for plaintiff was permitted to ask and obtained answers to leading questions; as, for instance, Mrs. Bethel was asked: "What were his character and habits as to industry, sobriety, etc.? A. He was industrious. Q. You didn't answer the full question. A. He had good health. Q. Mrs. Bethel, state to

the jury what was the earning power per year of Mr. Bethel. A. He was able to earn $1,000 a year." The latter question and answer were perhaps objectionable; but, when we consider that the jury returned a verdict of but $2,000 in a case where the man who was killed was but 46 years of age, and left surviving him a widow, and five children ranging in age from ten years down to eight months, we are unable to see how the question and answer complained of could have prejudiced the defendant. It is claimed the court erred in permitting an answer to the question: "What means of support had you and those children at the time of Mr. Bethel's death, other than his efforts?" We are unable to discover any error in this ruling.

It is further urged that the court refused to allow defendant to show the heavy rainfall "just immediately preceding the fall of the bridge in question." The questions to which the court sustained objections were propounded by counsel for defendant to one of plaintiff's witnesses on cross-examination. They were objected to as not proper cross-examination. We think this ruling was right. The fact sought to be elicited from the witnesses, if a defense at all, was an affirmative defense, which defendant could not establish upon cross-examination.

It is next urged that the court erred in refusing to give the first instruction asked by defendant. This was a peremptory instruction to find for defendant, and was properly refused.

It is next urged that the court erred in refusing to give the second instruction asked by defendant. In this instruction the court was asked to tell the jury that the county is not an insurer against accidents to those who travel upon the public highways, and that if from the evidence they believed "that shortly before the accident complained of there was heavy rainfall, causing high water in the stream or branch spanned by said bridge, and that the bridge in question was undermined by reason of such heavy rain which fell during the few days just preceding

the injury complained of, causing high water in said branch, and that defendant, through its officers whose duty it is to maintain and keep its bridges in a reasonably safe and suitable condition for the use of the traveling public, had no actual notice or knowledge of the undermining of said bridge, leaving it in an unsafe condition, in time that defendant's officers might have repaired the same before the accident, that such heavy rainfall and high water, causing such undermining, is the act of God, and the defendant would not be guilty of negligence and is not liable under the law, and you should find for the defendant." The trouble with this instruction is that the the evidence did not justify the giving of it. There was no evidence of any such unprecedented rainfall as would constitute an act of God; and, even if the rainfall, which is shown to have been sustained during the two or three days immediately preceding the accident, had caused the west bank of the creek to soften so that when the decedent drove upon it the bridge gave way, the testimony had shown the creek and bridge to have been in such a condition for several weeks or months prior thereto (if the jury believed such evidence to be true) as to have caused the officers of the defendant, if they had during that period of time made an examination of the bridge, as it was their duty to do, to have guarded against just such a contingency; a contingency which we think any reasonable man would, upon inspection, have immediately anticipated.

It is next urged that the court erred in refusing to give the third instruction asked by defendant. Everything proper in this instruction had been already covered by instruction No. 6, given by the court at the request of plaintiff.

It is next urged that the court erred in giving the second instruction offered by plaintiff. By this instruction the jury were told: "If you find from the evidence in this case that the bridge in controversy was upon and a part of a public highway in the county of Pawnee, in the state

95 Neb. 14

of Nebraska, and was a bridge which the said county was liable to maintain and keep in a suitable state of repair, and was out of repair at the time of the accident, and was defective and unsafe, and that because of said defective and unsafe condition the bridge gave way and caused the injury to the said Robert Bethel, from which he soon thereafter died, without his fault, and that such defective and dangerous condition of said bridge was such that it could have been discovered or detected by reasonable inspection and examination of the bridge, then you are instructed that this defendant would be liable because of such condition of said bridge." The only criticism of this instruction which we see is that the court possibly should have told the jury, that, if the defective and dangerous condition of the bridge was such that it could have been discovered or detected by reasonable inspection and examination of the bridge "in time to have repaired the same," the defendant would be liable. But, when this oversight is considered in connection with the testimony that the condition of the bridge immediately preceding the accident or the recent rainfall had existed for so long a time, we are unable to say that the omission of the words above suggested were prejudicial.

It is next urged that the court erred in giving the sixth instruction asked by the plaintiff. In this instruction the jury were told: "For an injury caused by an unsafe and defective condition of a county bridge, a county is liable for damages, notwithstanding the fact that no actual notice of such condition had, previous to the occurrence of the accident, been given to any officer of the county concerned, where the defects are of such a nature or have existed for such a length of time that, by the exercise of ordinary diligence, they might have been discovered and repaired." We think this was a concise and accurate statement of the law. It certainly is in harmony with *Hollingsworth v. Saunders County*, 36 Neb. 141, and *Raasch v. Dodge County*, 43 Neb. 508, and even with *Johnson County v. Carmen*, 71 Neb. 682, cited by counsel for defendant. The only reason why we reversed the judgment in

the *Carmen* case was that the defect shown in that case was a latent defect, which we there held would, if established, relieve the county from the charge of negligence. That is not the case here.

It is next urged that the court erred in giving the seventh instruction asked by plaintiff. This instruction involves another question arising in the case, which question will at once be discovered from a reading of the instruction: "If you find from the evidence in this case that the bridge in controversy was upon a part of a public highway, located upon the line between Pawnee county, Nebraska, on the north, and the state of Kansas on the south, part of said public highway being north of said interstate line and part of said highway being south of said state line, and that the said bridge in controversy was located partly north of said state line and partly south thereof, then and in that event you are instructed that the said defendant was under obligation to maintain and keep the said bridge in reasonable repair and in a reasonably safe condition, the same as if the said bridge and highway were located entirely within the said county of Pawnee; and that the liability of the defendant for damages resulting from the defective, insufficient and unsafe condition of said bridge is the same as it would have been had the said bridge and highway been entirely within the said county of Pawnee." The road ran east and west. The course of the creek was not at right angles with the road, but in going west veered a little to the north and west. That the bridge was substantially in the middle of the road and therefore directly on the state line, the northern part of the bridge being in the defendant county and the southern portion in Nemaha county, Kansas, was established by the testimony of Mr. Howe, the county surveyor of defendant county. After describing the manner in which he made his survey, he testified: "I located a point above east and west of that bridge on the ground, and there located a point exactly at the middle of the bridge, a point where this state line crossed the bridge. The latter line crossed the whole length of the bridge. The bridge

is not quite straight east and west; it varies a trifle, but not so far as to throw either end off the line. At the middle of the bridge I measured five feet and nine inches north from the line to the north side of the bridge. I didn't measure the south side; it was that distance at the side of the bridge at the middle point. The northwest corner of the bridge is a little farther from the line than the northeast corner. The bridge slants a little to the northwest and southeast, but not a great deal." Without going into the details, we think Mr. Howe's explanation of the manner in which he located the points from and to which he ran his line indicates that he had located the state line correctly.

This bridge was originally built by Nemaha county, Kansas. There is no evidence in the record to show that defendant county paid any portion of the cost of construction of the bridge, or that its officials were consulted in relation to its construction, or that they ever exercised any actual control over or made any repairs upon the bridge. It is the contention of the defendant that by reason of these facts it could not be held liable for any defects which might exist in the bridge or for any failure to keep it in proper and safe repair. We think in the instruction complained of the trial court took the correct view of the law. There is no question but what this road had been declared a public road by the proper officials of defendant county. The proceedings of the board were introduced in evidence, from which it appears that a petition locating this road was filed, a commissioner appointed who took the oath and filed his report; that notice to file claims for damages was given and notice to the sheriff to serve landowners along the line of the proposed road was given and served and return thereof made; that proof of publication was made; that on January 26, 1899, the county commissioners entered their final order locating this particular road, two rods in width north of the section line, along the south line of section 31, township 1, range 11. The order concludes: "And county clerk is directed to notify proper overseers of highways to

cause said road to be opened and put in condition for
public travel and worked in same manner as other roads
are worked." Indeed, counsel for defendant in his brief
concedes that the road in controversy "is a public road
laid out by the county commissioners of Pawnee county,
Nebraska, two rods in width, which was intended to be
located with its south line upon the south boundary line
of the state of Nebraska, which Nebraska road extends
along and past the place where Mr. Bethel lost his life in
the going down of the bridge;" but adds that "this Ne-
braska road has never been bridged or worked by Nebraska
officials so far as we know or are enlightened by the evi-
dence." This bridge being built upon the line between
the two counties, part of the bridge being in each county,
it was the duty of each county to use reasonable diligence
to keep the road in reasonably safe condition for the use
of the traveling public. If both failed, both were culpable,
and the fact that the bridge had been built by one of the
counties would be immaterial. If the evidence had shown
that defendant county had used reasonable diligence to
keep that portion of the bridge located within its boun-
daries in safe condition, there are authorities which hold
that that would have relieved it of liability, but that is
not this case. If defendant county had made proper in-
spection of this bridge, it would have discovered its dan-
gerous condition, and, if it had placed proper supports
under that portion of the west end of the bridge within
its boundary, it is difficult to see how this unfortunate
accident could have occurred.

In *Village of Marseilles v. Howland,* 124 Ill. 547, 548,
it is held: "But where a toll-bridge has been constructed
over a stream in a public street, and the bridge company
surrenders its franchise and rights, and the bridge be-
comes free to the public, and is used by the public, no
formal acceptance of the dedication is required of the vil-
lage in order to hold it responsible for the safety of the
bridge, as would be required in the case of a new street."

"In such case, the village may avoid liability for not
keeping such bridge in repair, but some affirmative action

on its part is necessary to show that intention. It might condemn the bridge as a nuisance and close it up, or vacate the street upon which it is located. If it takes no action, but suffers it to be used as part of the street, it must see that it is kept in a safe condition, or be liable for an injury from its neglect of duty."

In the opinion, on page 556, it is said: "The law imposed upon the village the duty to keep its streets and bridges in reasonable repair, in order that the public might safely pass over them. That duty could not be shifted upon another. The fact that the bridge was not built by the village does not relieve it of responsibility. An incorporated town is not bound to build a sidewalk upon a public street, but if one is constructed by an individual, and is used by the public with the knowledge of the town authorities, the law would require them to remove the walk or assume responsibility for its reasonably safe condition."

We think the reasoning in that case is quite in point here. It matters not who built the bridge in question. The fact that it was built by the officers of Nemaha county, Kansas, makes the case no different than if the bridge had been built by some adjacent landowner at his own expense, or by some person who had occasion to make frequent trips over the road. The fact that the bridge was built partly upon a public road which it was the duty of defendant county to keep in repair, and that the bridge was permitted to remain there for four or five years as a standing invitation to the public to pass over it, made it the duty of the defendant to see that it was kept in reasonably safe condition for such travel. The fact that Nemaha county, Kansas, was also derelict in its duty in this regard is immaterial. The duty rested upon both counties, jointly and severally, and their liability for a failure to perform their duty was in like manner joint and several.

It is next contended that the court erred in permitting plaintiff, after both sides had rested, to withdraw her rest and introduce further and different evidence upon

cross-examination, and complaint is made of the fact that plaintiff at that time sought to introduce an exhibit which the court, upon defendant's objection, excluded; but it is said the exhibit was so manipulated in the hands of counsel that some of the jurors saw it and were able to read portions of it. This exhibit was a claim which had been presented by Clear Creek precinct, Nemaha county, Kansas, against defendant county, for labor and work furnished and performed on the road in question, which was allowed by the county commissioners of defendant county. The court was not guilty of any abuse of discretion in permitting plaintiff to withdraw her rest. The error, if any, committed by the court was in not permitting plaintiff to introduce the exhibit referred to. While it did not refer directly to any expense in repairing the bridge, it did have a tendency to show that defendant had recognized its liability to reimburse the Nemaha county officials for work which they had performed upon this particular road.

It is next contended that plaintiff wholly failed to show any legal right or authority to maintain the action. The ground of this objection is that at the time the action was begun plaintiff was a resident of Kansas and had been appointed administratrix of the estate of decedent by the Kansas court. She was therefore a foreign administratrix, and as such had a right under section 5189, Ann. St. 1909, to commence and prosecute this action. Section 5188 of the same statute provides that when an executor or administrator shall die, be removed from office, or resign, or when his letters shall be revoked during the pendency of any suit in which he is a party, the suit may be prosecuted by or against the executor or administrator appointed in his place, if any shall be appointed, in like manner as if it had originally been commenced against such last executor or administrator. Counsel for defendant argues that plaintiff's letters of administration had been revoked by force of the Kansas statute when, after the commencement of the action, she removed from the state of Kansas into Pawnee county. There are two reasons why this contention must fail:   (a)   The Kansas

statute was neither pleaded nor proven. Hence, we must presume that the law of that state is the same as this, and in this state we have no law which *ipso facto* revokes letters of administration when an administrator removes from the state. (b) Conceding that the Kansas statute provided, as counsel argues, that the court "shall not appoint a non-resident, and shall revoke letters when executor or administrator becomes a non-resident," her removal would not, even under that statute, *ipso facto* revoke her letters. It would require an order of the court to make such revocation, and no such order is shown to have ever been entered. It follows, therefore, that, so far as this record discloses, plaintiff is still the administratrix of the decedent's estate, duly qualified to prosecute this action.

After a careful examination of the record, of the law applicable to the facts, as shown therein, and of the various points so ably urged and discussed by counsel for defendant, we are unable to discover any prejudicial error in the record. The question as to whether or not Nehama county is, under the law of that state, also liable to plaintiff, is not before us, as the law of that state is neither pleaded nor proven. When, however, we consider the fact of the decedent's age and the wife and family of small children whom he left without any means of support, in the light of the amount of the verdict of the jury, it becomes apparent that the jury adjudicated the question of contribution in the jury-room and returned their verdict for no more than half of the damages sustained which they could properly have found.

AFFIRMED.

BARNES, ROSE and SEDGWICK, JJ., not sitting.