CHARLES L. SHARP, APPELLEE, V. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY ET AL., APPELLANTS.

FILED MARCH 27, 1923. No. 22152.

1. **Highways:** OBSTRUCTIONS: LIABILITY OF COUNTY. A county cannot evade statutory liability for damages arising out of an obstruction in a highway by a plea that the repair and upkeep of such highway at the point where the injury occurred has by the county been delegated to another.

2. ———: ———: DANGER SIGNALS. When a railroad company for its own convenience places an obstruction in a highway where automobiles and other vehicles are accustomed to pass, it is its duty to place lights or other suitable warning signs upon such obstruction that the public may be warned of danger.

3. ———: NUISANCE: POWER OF LEGISLATURE. It is elementary that the legislature cannot vest county authorities with power to permit the installation of a structure in a public highway which amounts to a public nuisance.

4. ———: OBSTRUCTIONS: INJURIES: LIABILITY. Where a personal injury grows out of the negligent continuance of an obstruction permitted by a county to be placed in the highway, such county and the person or corporation which erected the obstruction are jointly liable for personal injuries arising therefrom.

5. ———: ———: DANGER SIGNALS. Where a county board permits an obstruction to be placed in a public highway and, in the plan which provides for such construction, no reference is made to the installation of lights or other contrivances to apprise persons of danger in the nighttime from driving into such obstruction, it should not be held that such county board had planned or ordered that such warning signs should not be installed.

6. **Appeal:** AFFIRMANCE. Where, in a personal injury action, the jury are properly instructed on the question of comparative negligence, and there is sufficient evidence to justify a finding either way, the verdict in such case should not for that reason be disturbed.

Sharp v. Chicago, B. & Q. R. Co.

APPEAL from the district court for Lancaster county: ELLIOTT J. CLEMENTS, JUDGE. *Affirmed.*

*Byron Clark, Jesse L. Root, J. W. Weingarten, Max V. Beghtol, Charles E. Matson, Harry R. Ankeny* and *Max G. Towle,* for appellants.

*Burkett, Wilson, Brown & Wilson, contra.*

Heard before MORRISSEY, C. J., LETTON, ROSE, ALDRICH, DAY and DEAN, JJ., RAPER, District Judge.

DEAN, J.

Plaintiff, as alleged, was driving east in an automobile on a highway about five miles west of Lincoln. The highway is a continuation of west O street, one of Lincoln's main business thoroughfares, and is a part of the road then known as the Omaha, Lincoln and Denver highway. The highway is paved for about eight miles west of the city, and at a point about five miles west of the corporate limits it intersects a crossing of defendant railroad. In 1918 the railroad tracks were elevated several feet at the street intersection and a railroad bridge was constructed by the company over the highway to permit travel on the street thereunder. The subway under the track was also constructed by the railroad company. The bridge is supported by large timbers or pillars in the center of the subway, midway between the north and south borders of the paved highway. As plaintiff approached from the west his car ran into the company's central bridge support, and from the resulting impact he received serious personal injuries and his car was damaged.

Alleging that Lancaster county was also liable in that it negligently permitted the railroad to construct the bridge in a negligent manner, in that the supports were placed in the center of the road without any warning sign, plaintiff made the county a party defendant. For the personal injuries so sustained, and for the damage to his car, plaintiff recovered a verdict and

judgment for $6,750. Defendants appealed separately.

Plaintiff was an insurance solicitor. Before the accident he earned about $5,000 or $6,000 a year. He was then aged 51 years. With respect to his injuries he testified in substance that in the evening of October 8, 1920, he was driving alone to Lincoln in a Ford car; that he reached the intersection in question about 7:30 or 8 o'clock; that the night "was very dark and windy," and the "weather was very dry at that time and the dust was very bad." With respect to the immediate happening of the accident he testified:

"Well, I was on the paving and it was very dark and very dusty. The dust would come in waves, and I met several cars, and when I would meet those cars I would pull out to the side of the street and stop and wait till they got by. Nobody turned on their dimmers because it was so dark, and it would blind a person to look in them and I would pull out and stop. Then I would pull up in the center, as near as I could, in order to keep from running off either side;" that he had never seen the Burlington bridge until the night in question, though in years gone by he had traveled the road; that he did not see the piling before he struck it with his car.

He further testified: "When I hit the piling there seemed to be a flash of light, and my face seemed to be upward and I saw what I thought was a telephone pole; and I thought I had hit a telephone pole. I never thought of such a thing as there being such an obstruction in the road. I supposed I had hit a telephone pole, looking up just a moment, a second, a flash, and that is all I know. I am all through after that." That he had no recollection of how he got home or of anything that happened until Christmas; that the accident greatly impaired his memory and his ability to recognize persons; that he had eight teeth broken, his head was badly hurt, and two pieces of bone were removed from one of his fingers; that at the time of the trial his

breathing was "congested" and that it was then hard for him to breathe; that before the injury he was strong and able-bodied and his health was good and he never had any of the trouble that continuously afflicted him since then; that at Christmas he could not yet stand on his feet; that he had driven a car a great deal for about 12 years and never before had an accident; that in his business as an insurance solicitor he traveled almost exclusively in an automobile, and that at the time the car was reasonably worth $400, but was value-less afterward.

Before the examination of plaintiff closed it developed that his hearing was impaired, and that he was "deaf in one ear," and that he had difficulty in recalling names of persons. Plaintiff testified that he was a careful driver; that his rate of speed at the time was about 15 miles an hour, and that it was never more than 20 miles an hour on paved roads; that just before he struck the pier the dust whirled around so that he could not see 6 feet ahead.

Ralph Cox, a young man living 300 or 400 feet south of the intersection testified that he heard the car strike against the piling about 7:30 or 8 o'clock; that he saw the headlights of a car about 200 feet away coming from the east just a few seconds before the impact; that by the sound he thought the two cars must have collided; that he and his brother found plaintiff sitting in his car leaning forward over the steering wheel, which was in an upright position and evidently bent forward; that plaintiff "seemed to hold his chest; his hand was bleeding slightly and one limb;" that there was no warning signal at the bridge, but the piling was painted white, and that after the accident a danger signal was placed in the center of the piling. Subsequently all of the evidence respecting the "changed condition," to which the witness testified, was stricken out and the jury were instructed not to consider it at all.

The testimony of Ralph's brother, Ray, with respect

to plaintiff's condition, was substantially to the same effect, and also that of Robert Cox, the father of the young men. The latter testified, however, that the first thing he remembered hearing plaintiff say was that he did not see the piling; that plaintiff insisted that he could get out of the car without help, but he could not do so and had to be helped until he got almost to the car in which he was taken home, "then he seemed to kind of faint away." It appears from the evidence of Mr. Cox that as the bridge is approached from the west two large danger signs have to be passed and they are visible at night with the aid of ordinary automobile lights.

Three physicians were called who had attended plaintiff. Another testified as an X-ray expert. Dr. Bently, a physician of about 40 years' experience, testified that when he was called to plaintiff's residence, the night of the injury, he found him bruised and delirious; that he bandaged three fractured ribs and both lower limbs; that the back of his neck was bruised, stiff, sore and swollen; that this condition continued several weeks; that he had a glass cut near his right eye and another on the jaw and chin and a severe gash on the right leg between the knee and the ankle, and he was bruised on the left leg and on the middle finger of the right hand; that he suffered considerable pain and had to be kept under opiates; that his back was strained, "so that he had to be lifted up and down on account of the pain and soreness in the lumbar region; the chest was pretty sore, tender to touch and difficult breathing; his neck was stiff and he could not turn his head either way for two or three weeks. He had to be raised up. After we got him out of bed he had to be raised up in an elevated chair for quite a while in order to sit up at all." and he was unable to walk.

The evidence of the other two physicians substantially corroborated Dr. Bently's evidence, and one of them who was subsequently called to treat plaintiff for a con-

siderable period testified that the patient's right leg was broken and that one limb was swollen "about a quarter larger than the other." This physician testified that up to the time of the trial, which was a little more than six months after the accident, he was still "treating him for the general stiffness and inability to get around."

Plaintiff's wife testified that for 11 weeks or there-abouts her husband had to sleep in a chair, and for all of that time he was unable to bear any weight on his feet, and that he had to be carried from one chair to another; that he did not get out of the house until the second week in January and then only to the front porch.

In respect of the installation of the subway under the proposed railroad bridge, the county alleges that sometime in December, 1917, a letter was addressed by defendant railroad to the county surveyor which was by that official referred to the board of county commissioners. The contents of the letter are not shown, but from the tone of a resolution of the board, dated December 12, 1917, it appears that it purported to relate, in a very general way, to a proposed creation of a subway, under the railroad, at the intersection where the accident occurred. Following the receipt of the letter the board adopted a resolution which is incorporated in the respective answers of both defendants. The resolution, so far as material here, follows:

"Resolution. Whereas, a letter of December 11, 1917, to Arthur E. Edgren, county surveyor of Lancaster county from the Chicago, Burlington & Quincy Railroad Company, has been referred by the said Arthur E. Edgren to this board, and whereas, it is desirable that official action be taken regarding the proposed subway on the O. L. & D. road west of Cushman and east of Emerald referred to in said letter: Therefore be it resolved by the board of county commissioners of Lancaster county, Nebraska, in regular session this 12th day of December, 1917, that it is the sense of said

board that the following plans would be acceptable: First. That the Chicago, Burlington & Quincy Railroad Company construct in 1918 a double subway for vehicles, each opening sixteen feet wide and fourteen feet high with an eighteen inch drainage opening below the ground. Second. That the Chicago, Burlington & Quincy Railroad Company do all grading on its right of way for such subway, also bear the expense for the extra amount of pavement necessary to fit the double sixteen-foot opening rather than a normal width of paving eighteen feet as is provided on the rest of the road, but only so much of said extra paving as shall be on the Chicago, Burlington & Quincy Railroad right of way. * * * Fourth. This board on its part to abandon the present grade crossing during the construction period and after the subway is completed to abandon the grade crossing permanently. * * * Sixth. After the completion of the subway on the Cox crossing (presumably the crossing in question) this board will take action and consider the closing of road No. 604 over the Chicago, Burlington & Quincy Railroad track; provided that a proper petition is filed therefor, or when this board is vested with jurisdiction in the premises. Seventh. The Chicago, Burlington & Quincy Railroad to retain to itself control for grant of wires or other structures through the opening so that safety of the public and of the railroad company can be provided for, and to retain also control of the advertising features afforded by the walls of the subway so as to keep the structure free from objectionable matters."

The county denies liability, and in support of its contention cites 7 Am. & Eng. Ency. of Law (2d ed.) 947. and Elliott, Roads and Streets (3d ed.) 535. The cited authorities merely hold that a county cannot be held liable for a negligent breach of duty respecting the care of public highways where there is no statute creating the liability. But in Nebraska we have such a statute, so that the cited authorities are not in point.

Section 2746, Comp. St. 1922, provides: "If special damage happens to any person, his team, carriage or other property by means of insufficiency, or want of repairs of a highway or bridge, which the county or counties are liable to keep in repair, the person sustaining the damage may recover in a case against the county. * * * Provided, however, such action is commenced within thirty days of the time of the injury or damage occurring." *Hollingsworth v. Saunders County,* 36 Neb. 141; *Swift v. Sarpy County,* 102 Neb. 378; *Higgins v. Garfield County,* 107 Neb. 482.

Failing in that defense the county attempts to evade statutory liability by a plea that the repair and the upkeep of the road was delegated to another. But that is no defense. In Iowa it was held that the county's duty to maintain an approach to a bridge and to keep it in reasonable repair "cannot be so delegated to others as to relieve the county from liability if the approach should be negligently constructed or negligently permitted to become out of repair." *Clark v. Sioux County,* 178 Ia. 176; *Bethel v. Pawnee County,* 95 Neb. 203; *Early County v. Fain,* 2 Ga. App. 288; *Interurban R. & T. Co. v. City of Cincinnati,* 94 Ohio St. 269; *Harriman v. Moore & Co.,* 74 N. H. 277. In *Brengman v. King County,* 181 Pac. 861 (107 Wash. 306), where the court had under consideration an injury that arose from the removal of a barricade in the highway which was being repaired, the court said: "It is the duty of a county to show such lights around a place where an obstruction exists and where automobiles are accustomed to pass, that one approaching can see that a dangerous condition exists." And this rule, as pertaining to railroad crossings, is particularly applicable to a highway in the open country where rules of the road cannot be strictly supervised.

To establish its nonliability the railroad company, *inter alia,* insists that the plan for the construction of the bridge, as built, was submitted to and approved by

the county authorities, and that the subway was excavated and the bridge built pursuant to such plan. Hence, it argues that as to it liability does not attach.

Aside from the point of law involved, we do not think the evidence of the company itself on this point, when fairly construed, sustains the argument. The county engineer, who' is also county highway commissioner, testified that, as such, he was "in charge of the construction and maintenance of the roads and bridges in the county." He also testified that a plan of a proposed bridge was submitted to him by the railroad company, which he examined, and that he conferred with the county board with respect thereto. He was then asked if he "observed whether it was built according to those plans * * * and according to the resolution passed by the board? A. It was not built according to the first plan submitted. * * * Q. What were those first plans? A. The first plan was for a permanent concrete structure Q. Was that later abandoned? A. Yes, sir. * * * Q. Did you confer with the engineers of the Burlington regarding the abandonment of that? A. Yes, sir. Q. Do you know why the plan was abandoned? Mr. Wilson: Plaintiff objects unless he shows the source of his information. Court: Overruled. Yes, or no. (Exception.) A. I do. Q. You may state why. Mr. Wilson: Plaintiff objects because it is now apparent that he got his information from the engineers of the Burlington, which would be hearsay. (Objection overruled. Exception.) A. Because it was vetoed by the director general of railroads at that time." When asked if he conferred with the board of county commissioners regarding the double passage way plan under the bridge, he testified: "I think I did."

It is to be noted that while on his direct examination the county engineer testified that the resolution of the county board, in evidence, referred to the bridge that was finally constructed, on the cross-examination he testified: "Q. At the time the county commissioners

passed this resolution the only plan that had been submitted up to that time was for the concrete bridge, was it not? A. I don't remember, but it probably was. I don't remember." So that it fairly appears, as plaintiff contends, that there was evidence before the jury upon which it might reasonably conclude that the plans of the bridge structure which was finally built had not been submitted to the board when the resolution was passed. Anyhow it was a question of fact for the jury.

There is evidence, as hereinbefore noted, tending to prove that plaintiff had no knowledge of the existence of the obstruction until he struck it. It was further shown that at a point 50 feet west of the bridge, at the edge of the paving, there was "a large concrete sign on the right-hand side of the road some four or five feet across," and that the word "danger" was cut into the concrete. The evidence on this point, which was developed by defendant on the cross-examination, would tend to support a finding by the jury that the danger sign was an admission on the part of defendant that the obstruction which it placed in the road was a menace to travelers passing that way. This evidence and the evidence that the lights on plaintiff's car were thrown directly in front, and also the evidence in respect of the dust storm and the darkness and the flash of light, evidently from the car which approached from the east, and which momentarily blinded plaintiff, all taken together doubtless tended to convince the jury that the negligence of the defendants was the proximate cause of the accident. It is elementary that the public may assume that those who are charged with the maintenance of highways have performed their duty.

In *Robertson v. Monroe*, 116 Atl. (N. H.) 92, the court held: "A person injured by the dangerous approach to a highway, created by act of the selectmen some time before, may allege both the original negligence in creating the danger and the negligent failure to erect barriers or place lights, and may recover for

whichever negligence the proof shows was the proximate cause of the injury, though a finding that failure to guard was the cause would preclude recovery for the original wrong."

In *Town of Mt. Pleasant v. City of New York,* 191 N. Y. Supp. 741, it is said: "A structure designed to carry an aqueduct across a highway consisting of solid masonry and earth embankments extending into the highway about 33 feet on its westerly side and about 13 feet on the easterly side, leaving a roadway under the arch of but 20 feet, is a public nuisance unless legal authority exists therefor. * * * It is not within the power of municipal authorities to consent to the occupation of a public highway by a permanent structure amounting to a public nuisance, nor is it within the power of the legislature to vest them with such power."

That the question of contributory negligence in a like case, was one of fact for the consideration of the jury is pointed out in *Corcoran v. City of New York,* 188 N. Y. 131. See, also, *Chisholm v. State,* 141 N. Y. 246; *Flynn v. Town of West Hartford,* 98 Conn. 83; *Kelsea v. Town of Stratford,* 118 Atl. (N. H.) 9.

In *Stone v. City of Seattle,* 70 Pac. 249 (30 Wash. 65) it was held: "A city cannot escape liability for injury from a defective sidewalk because the defect is part of the original plan of construction. Whether a city is negligent in placing an electric light so that the shadow of the pole supporting it conceals a hole in a sidewalk is a question for the jury."

Very respectable authority holds that, even though the defect is in the plan, as distinguished from the mode of execution, such fact will not relieve from liability. *Schrader v. City of Port Huron,* 106 Mich. 173; *City of Circleville v. Sohn,* 59 Ohio St. 285.

In *City of Chicago v. Seben,* 46 N. E. 244 (165 Ill. 371) it was held: "A city is liable to an individual for injury received from an unsafe condition of the street, whether arising from construction of sewer according

to an adopted plan, and its failure to remedy it, or from failure to repair defects arising after construction of the sewer."

In *Sebert v. City of Alpena,* 43 N. W. 1098 (78 Mich. 165) it was held: "Laws Mich. 1887, p. 345, requiring cities to keep streets reasonably safe and fit for travel, applies to a defect in construction as well as to neglect to repair; and the safety required extends to travel by night as well as by day." See *City of Dayton v. Taylor's Administrator,* 62 Ohio St. 11.

In *Perrotti v. Bennett,* 109 Atl. 890 (94 Conn. 533) it was held: "Although the state or highway commissioner could not be held liable for error in the adoption of a plan of highway construction whereby a sewer was improperly covered for, heavy traffic, there was liability for the negligent continuance of such a condition, resulting in injury to plaintiff's motor truck." In the body of the opinion it is said that, when the plan in its execution creates a nuisance or causes direct injuries to another, liability follows for the damage done. The court further observed: "If the plan be defective from the beginning, or if its defect originate shortly after the completion of the improvement and injury be ultimately necessarily the inevitable or probable result, the municipality will be liable. Clearly this is just. Upon this assumption the city created the defective improvement and either knew of it or was chargeable with knowledge of it. Every moment of its continuance was an act of negligence by the municipality. The injury grew out of and was attributable to this negligent continuance and not to the plan so defectively conceived of, but to the operation of the plan after its defective condition was known or ought, in the exercise of reasonable diligence, to have been known to the municipality."

In *Gould v. City of Topeka,* 32 Kan. 485, it is said: "If a city or its governing board should order that a high and narrow embankment, with precipitous sides, should be made in a public street for the purpose that

the travel should pass over the embankment, and should say nothing concerning railings, guards, or other barriers, and · nothing concerning street lamps or other lights, to prevent persons in the nighttime from falling or driving off the embankment and thereby being injured, it should not be held that the city had planned or ordered that no such railings, guards, barriers, lamps, or lights should be used. There should be no presumption that the city authorities had ordered or planned that a public street should be · dangerous." Continuing the court observed: "It should be held that the city had made no order with reference thereto; and then we would further think that if no such railings, guards, barriers, lamps, or lights were used, and thereby injury should result, the city should be held to be liable."

In *Gulf, C. & S. F. R. Co. v. Sandifer*, 69 S. W. 461 (29 Tex. Civ. App. 356) it is said: "Where a railroad company constructs on its right of way a bridge over a ravine, together with approaches; the bridge and approaches being likewise in, and constituting a part of, the roadway of a city street; the whole leading up to the railroad crossing; and one of the approaches is dangerous to travelers, from want of a guard rail to prevent falling over its side into the rocky ravine, nine feet below, both the city and the railroad company are liable for injuries to travelers thereby occasioned."

In *People v. Delaware & H. Co.*, 69 N. E. 651 (177 N. Y. 337) it was held: "While a railroad company may carry the highway over or under its track, in its discretion, subject to its duty to restore the highway to such a state as not to impair its usefulness, the company cannot be said to have restored the highway to such a state as not to have unnecessarily impaired its use, where the restoration seriously affects its use, though it may be practicable to use it, while by restoration in another manner the use would be wholly unimpaired."

In *Harriman v. Moore & Co.*, 67 Atl. 225 (74 N. H. 277) this was said: "A traveler on a highway need not,

to hold one placing an obstruction in the highway liable for an injury sustained in consequence thereof, show that the injury was due solely to the obstruction, if his conduct in no way contributed to the injury."

If the rule is to prevail which is advanced and practiced by defendants, with respect to the approval and the adoption of a plan of highway construction by public authorities, and the construction ultimately proves to be a menace to the public, it follows that such authorities may, by some such subterfuge, wrongfully escape liability for the installation of dangerous devices and constructions.

The rule announced in the *Gould* case and in the other cases cited herein on the same point is sound, and, pursuant to the rule, which we approve, the county authorities should not have neglected to first consider the question of safeguarding the public by the installation of lights or other warning devices, and such safeguards should have been subsequently installed. The central piers are a standing menace, an ever present peril to every passing car at a point where, in the nature of things, cars would only chance to meet at intervals.

Counsel argue generally that the pier in the center of the highway under the bridge, and at the bottom of a declivity, tends to minimize the danger of cars colliding when traveling in opposite directions. We do not think so. By the same token it could be established that an unlighted row of telephone poles placed in the center of a highway in the open country would minimize the danger of travel by night and by day.

The defendants cite *Watters v. City of Omaha*, 76 Neb. 855, but that case is not in point because the dangerous nature of the construction complained of here is obvious, and besides the erection by the company of the "danger" sign, to which reference has been made, must be taken as an admission against interest. And in this connection it may be noted in passing that the resolution

of the county board, hereinbefore cited, shows that the railway company retained "to itself control for grant of wires or other structures through the opening so that safety of the public and of the railroad company can be provided for." In that paragraph the danger appears to have been recognized by the county and by the company, but no means were employed by either of the defendants to avert it, though the company was apprehensive concerning public safety.

The accident occurred almost two years after the war was ended, and there is nothing in the record to show that the railroad company was prevented from installing the proposed steel and concrete bridge, without central piers, after the war and before the date of the accident. And, besides, there is no competent evidence to show that the installation of a steel structure "was vetoed by the director general of railroads," as testified by the highway commissioner.

Defendants complain because the court, in its statement of the case to the jury, incorporated the major part of the pleadings in the instructions, a practice which has often been condemned by this court. But in the present case the objection is not clearly available for the reason that evidence was presented on every material allegation in the respective pleadings.

Other of the instructions have been assailed by defendants, and exceptions have been taken because certain instructions offered by defendants were refused, but we do not find prejudicial error on that feature of the case

Defendants argue that plaintiff's negligence was the proximate cause of the accident. But the question of comparative negligence was submitted to the jury and there was sufficient evidence to justify a finding either way. It follows that the verdict should not be disturbed on that ground. The action is based upon a plain statutory provision from which, in view of the negligence complained of, there appears to be no escape. *Raasch v. Dodge County*, 43 Neb. 508; *Hollings-*

*worth v. Saunders County,* 36 Neb. 141; *Roberts v. Chicago & N. W. R. Co.,* 35 Wis. 679. Every controverted fact which is material to the issues presented here was submitted to the jury by the learned trial court under instructions which are unassailable. For this court to say that the questions of fact which are involved here, any or all of them, are questions of law for the court to decide and not questions of fact for the jury to decide is to deny to that body the exercise of an ancient and time-honored prerogative. We are not prepared to go so far. *Seaton v. State,* 106 Neb. 833, at page 837.

We do not find reversible error. The judgment of the district court is

AFFIRMED.

RAPER, District Judge, dissents.

ROSE, J., dissenting.

I am compelled to dissent because it seems to me that the fundamental principles of law applicable to the undisputed facts show conclusively that there was no actionable negligence on the part of either defendant and that the injuries to plaintiff were caused solely by his own negligence.

At the place of the accident the paved highway runs under the railroad bridge. A row of piers, painted white to make them conspicuous, extends lengthwise through the center of the pavement which is divided into two roadways under the railroad track. At each side of the row of piers the driveway is as wide as the pavement by which the subway is approached from both directions. There is a perpendicular wall on each side of the subway. The piers divide the traffic in the center and keep each line of travel on the right-hand side and prevent the line in one direction from crowding the line in the opposite direction, where, on account of the walls, there is no escape from reckless drivers by leaving the pavement. The feature of highway construction condemned amounts to a mere slight bend in the road. It

is a bend to which every traveler on the right-hand
side of a highway is exposed where a wide roadway
tapers to a narrow bridge. A mere bend in a road
with white posts by the roadside is not a dangerous
highway construction.  Dividing a road into two
branches, with a park, or a row of trees, or a line of
poles, or a trolley between, is a safe and usual con-
struction in country roads and in city streets, within
the meaning of the law making counties liable for the
negligent failure to keep highways in a safe condition
for travel. This construction is within the knowledge
of travelers generally and is as old as common covered
bridges having two driveways with a wall between.
These conditions are generally known to exist, and all
mature, normal travelers of ordinary intelligence are
acquainted with the facts or are chargeable with knowl-
edge thereof. Highway travelers for generations have
been exposed to the usual dangers of divided roadways
and curves.  No rational system of highway engineering
requires counties or transportation companies, in dis-
charging road-making duties, to construct roads without
curves, or prevents the dividing of roads with rows of
trees, or poles, or trolleys, or parks between, nor demands
reflectors of light where these conditions exist in country
places.  The highway system of ancient Rome once in-
cluded straight roads radiating from the Imperial City,
but curves and branches are now everywhere recognized
as necessary.  Even in Italy a covered bridge, centuries
old, with two driveways divided by obstructions, is still
in use.  The statute declaring section lines to be high-
ways does not prevent necessary curves, or divisions, or
branches, or justify a traveler in pursuing a .straight
course in the dark, never thinking of obstructions.
Modern engineering skill is shown in the approaches to
beautiful cities, where the highways divide and run
through ornamental parks.  In places like those de-
scribed the failure of travelers to use their senses and
observe and follow the curves of the roads and streets

not only courts self-injury or death but exposes others to extreme hazards.

The statute making a county liable for damages resulting from a failure to keep the highways in a safe condition for travel is not a public guaranty of the safety of travelers or a form of insurance to protect the reckless from the consequences of their own negligence. From a county's former immunity from suit to the affirmance of a judgment for plaintiff's injuries, seems to me to be a radical departure from the fundamental principles of law applicable to the indisputable facts.

On the face of the majority opinion itself evidence that plaintiff was injured solely as the result of his own negligence is as clear as the failure to prove any negligence of defendants.

According to the opinion of the majority the story of plaintiff, as told by himself on the witness-stand, shows that he had never before seen the bridge over the highway; that it was dark and windy, dry and dusty, the dust coming in waves; that the dust whirled so he could not see six feet ahead; that he tried to keep in the center of the road; that he "never thought of such a thing as there being such an obstruction in the road;" that he did not see the pier until he struck it; that the collision occurred when he was going 15 miles an hour.

The negligence of plaintiff and the resulting injuries are thus demonstrated by his own testimony. Going 15 miles an hour in a dust-storm which prevented him from seeing six feet ahead, he pursued a straight course, never thinking of an obstruction or a curve. Pursuing the same course elsewhere under similar conditions he would have run off the road at any bend, division, or branch, regardless of consequences. The darkness, the dust-storm and the approaching headlights were not creations of defendants, but were ordinary incidents of travel which mature, careful persons on a highway anticipate. The instinct and means of self-preservation bestowed by nature upon plaintiff were not under the control of de-

fendants. Had plaintiff exercised the attributes of normal, human existence, he would not have been injured. The notice of "danger" not far from the piers was no more an admission of faulty highway construction than the same familiar signal at any other ordinary bend in the road.

The injuries to plaintiff make a strong appeal to sympathy and charity, but do not legally create an involuntary public burden upon taxpayers whose representatives in office have been guilty of no actionable wrong; nor should the burden of plaintiff's negligence fall upon those who pay the expenses of railroad transportation. Judicial pronouncements which unnecessarily tend to weaken personal responsibility and reward carelessness at the expense of the public will not make litigation a better means of obtaining justice, improve the individual members of society, or aid the government in protecting law-abiding citizens from the menace of reckless drivers.

It seems to me the judgment affirmed extends liability for damages beyond legal or just bounds. As I view the undisputed facts defendants did not violate any private or public duty. Plaintiff's injuries resulted solely from his own negligence. The judgment should be reversed and the action dismissed.

LETTON, J., concurs in this dissent.